UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN EXPRESS BANK LTD.,

Plaintiff,

- against -

BANCO ESPAÑOL DE CRÉDITO, S.A.,

Defendant.

---

1:06-cv-03484-RJH

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

This case is about international demand guaranties, a form of commercial credit used to secure the performance of international construction contracts.  In particular, it involves a bank's attempts to enforce another bank's counterguaranties, despite the fact that it has refused to pay the primary guaranties on the ground that demand was made in bad faith.

The banks' dispute originates in two contracts to build power substations in Pakistan.  The contractor, a Spanish company, claims that it fully performed the contracts.  The purchaser, a semi-autonomous agency of the government of Pakistan, thinks otherwise.  A panel of arbitrators appointed by the International Chamber of Commerce ("ICC") sided with the contractor and directed the Pakistani purchaser to cancel guaranties securing the contractor's performance.  Instead of abiding by the arbitrators' decision, the purchaser continued to demand payment of the guaranties and initiated an action in Pakistan to set aside the award and enforce the guaranties. Neither the contractor nor the purchaser is a party to this action.

In this dispute between the banks, the Court holds that: (1) the guaranties and counterguaranties are governed by letter-of-credit law; (2) in light of the final, binding ICC award, the guarantor, plaintiff American Express Bank ("AEB"), has no obligation to pay under its guaranties and, therefore, no good faith basis to demand payment of the counterguaranties issued by Banco Español de Crédito ("Banesto"); and (3) AEB's request for a declaration that it will be entitled to payment in the event that it is compelled at some future date to pay in Pakistan is not presently justiciable. AEB's complaint is therefore dismissed without prejudice to the filing of a new action following further developments in Pakistan.

## I.     BACKGROUND

The history of this case is long and spans four jurisdictions. The Court recounts only enough of it to explain the basis for the current decision. In doing so, the Court accepts as true the factual allegations of the complaint, *see, e.g.*, *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 432 (2d Cir. 2008); relies on undisputed facts contained in public records, *see, e.g.*, *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); and makes additional findings of fact necessary to determine whether the Court has subject matter jurisdiction, *see, e.g.*, *Kamen v. Amer. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

### A.     The Underlying Contracts

In April and July 1995, Isolux Wat S.A. ("Isolux") and the Pakistan Water and Power Development Authority ("WAPDA") entered into two contracts for the construction of electrical substations in Pakistan. (*See Isolux Wat, S.A. (Spain) v.*

*Pakistan Water & Power Dev. Auth. (Pakistan)*, ICC Case No. 13158/KGA, at 2 (Feb. 6, 2007) ("ICC Award"), Cadarso Decl. Ex. B.; Terms of Reference, *Isolux Wat, S.A. (Spain) v. Pakistan Water & Power Dev. Auth. (Pakistan)*, ICC Case No. 13158/KGA, at 2 (Oct. 22, 2004) ("Terms of Reference"), Walker Decl. Ex. C.)  Isolux is a Spanish engineering and construction company.  (ICC Award 2.)  WAPDA is a semi-autonomous agency of the government of Pakistan, which is responsible for coordinating infrastructure development schemes in the water and power sectors.  (WAPDA, The Authority, http://www.wapda.gov.pk/htmls/auth-index.html (last visited Nov. 7, 2008).)

The contracts required Isolux to install two 220/132 KV substations (the numbers refer to voltage), and to supply and install telecommunication equipment for twenty lower voltage peripheral grid stations.  (ICC Award 2.)  In exchange, WAPDA apparently agreed to pay Isolux about $35 million.  (*See* ICC Award 11.)  In the event of a dispute, the parties agreed to submit their claims to arbitration at the ICC.  (*See* ICC Award 2.) The arbitration clause provided that "any difference, dispute or question arising out of or with reference to this agreement which cannot be settled amicably . . . shall within 60 days from the date that either party informs the other in writing that such difference[,] dispute or question exists, be referred to arbitration of three arbitrators."  (*Id.*)  The clause further provided that "[t]he award of the majority of the [arbitrators] shall be final and binding on both parties."  (*Id.*)

**B.** **The Guaranties and Counterguaranties**

To secure Isolux's performance, WAPDA required Isolux to obtain two demand guaranties.[1]  Such guaranties, which are common in international construction contracts, provide a simple way for a buyer to obtain cash for substitute performance if a contractor defaults.  (*See generally* David J. Barru, *How to Guarantee Contractor Performance on International Construction Projects: Comparing Surety Bonds With Bank Guarantees and Standby Letters of Credit*, 37 Geo. Wash. Int'l L. Rev. 51 (2005).)  Isolux asked defendant Banesto to arrange the guaranties.  (*See* Compl. Ex. 1.)  Banesto in turn asked AEB, the plaintiff here, to execute guaranties in favor of WAPDA in Lahore, Pakistan.  (*See id.*)  This kind of arrangement is also common, since buyers frequently prefer to work with local banks, such as the AEB branch in Pakistan, instead of unfamiliar foreign institutions.  (*See generally* John F. Dolan, *The Law of Letters of Credit: Commercial and Standby Credits* ¶ 1.03[1], at 1-16 (Rev. Ed. 1996) ("Dolan").)  The AEB branch in Pakistan agreed to issue guaranties to WAPDA, provided that Banesto issue counterguaranties in its favor.

The following diagram summarizes the legal relationships between WAPDA, Isolux, and the banks.  The instruments at issue in this action appear in bold:

---

[1] The record contains many variations on the spelling of "guaranty" and "guaranties." The Court uses the American spelling without intending any change in meaning.



**Figure 1**

Banesto and AEB made arrangements for the guaranties in a series of SWIFT messages sent in November 1995.[2] On November 16, Banesto sent AEB a message asking that it issue two guaranties in WAPDA's favor, both for a total of U.S. $1,778,571.50 and 5,486,500 Pakistani rupees.  (Compl. Ex. 1.)  The critical undertakings in the guaranties provided:

> the surety [i.e., AEB] waiving all objections and defences under the aforesaid contract, hereby irrevocably and independently guarantee[s] to pay to WAPDA without delay upon WAPDA's first written demand any amount claimed by WAPDA upto [sic] the sum named herein, against WAPDA's written declaration that the principal [Isolux] has refused or failed to perform the aforementioned contract.  (Compl. Ex. 1 (capitalization normalized).)

---

[2] The acronym stands for "Society for Worldwide Interbank Financial Telecommunication," a cooperative society organized under Belgian law.  SWIFT operates a secure, worldwide financial messaging network that banks use to do business with one another.  (*See* SWIFT, About SWIFT, http://www.swift.com/index.cfm?item_id=41322 (last visited Nov. 7, 2008).)

AEB, in other words, agreed to pay WAPDA under the guaranties based on a written certification that Isolux had failed to perform.  For its part, Banesto agreed to repay any liabilities AEB incurred under the guaranties.  Specifically, Banesto's messages to AEB promised, in banker's pidgin, that "Our counterguarantee irrevocable unconditional in your favour is valid to receive your eventual claims made under your guarantee that we undertake to pay to you on your first demand notwithstanding any contestation from us or our applicants part [sic] or third party."  (*Id.* (capitalization normalized).)

On November 30, 1995, AEB executed the guaranties.  (Compl. Ex. 2.)  At Banesto's request, the guaranties' expiration dates were extended from time to time, most recently until September 30, 2004.  (Compl. Ex. 3.)

**C.    Contract Disputes**

By 2004, disputes arose regarding Isolux's performance of the contracts and WAPDA's concomitant payment obligations, the details of which are unimportant here. (*See generally* ICC Award 2, 11-16.)  The disputes provoked legal proceedings in four jurisdictions: Switzerland, Spain, Pakistan, and the United States.  Since 2004, however, neither AEB nor Banesto has paid anyone a cent.  (*See* Compl. ¶ 14; Pl.'s Mem. in Supp. of Summ. J. 9 n.6 ("Pl.'s First Mem.").)

Legal proceedings began on February 11, 2004, when Isolux submitted a request for arbitration to the ICC International Court of Arbitration.  (Terms of Reference 2.) Isolux's request sought money damages and an order requiring WAPDA to return all the guaranties issued in connection with the construction contracts.  (ICC Award 13.)  At the same time that Isolux submitted  a request for arbitration, it obtained an injunction from a Spanish court to freeze the status quo.  The injunction (1) enjoined WAPDA from

demanding payment on the AEB guaranties, and (2) directed Banesto not to honor any requests for payment of any guaranties or counterguaranties related to the construction contracts.  (*See* Auto [Court Order], Juzgado de 1° Instancia N° 42, Madrid (Feb. 2004), Walker Decl. Ex. H, at 4).)

Five months later, WAPDA informed AEB that Isolux had failed to performed the underlying contracts and demanded payment of AEB's guaranties.  Without having paid the guaranties, AEB on July 15 and July 16, 2004 sent Banesto SWIFT messages demanding payment of the counterguaranties.  (Compl. ¶¶ 12-13; *see* Aff. of Farhad Subjally Ex. 5.)  Banesto refused, citing the Spanish injunction.  (*See* Compl. ¶ 14; Letter from Antonio Ortega Suárez, International Energy Manager, Isolux Wat, S.A. to WAPDA (Aug. 6, 2004), Walker Decl. Ex. I.)

In February 2005, WAPDA filed a lawsuit against AEB in Lahore, Pakistan to recover on the guaranties.  (*See* Summons and Compl., *Pakistan Water & Power Development Authority v. American Express Bank, Ltd.*, Civil Suit No. 30 of 2005 (Lahore High Court Feb. 10, 2005), Ex. B to Letter from Stephen Marzen to Hon. Richard J. Holwell (June 1, 2007).)  The complaint alleged that Isolux failed to perform the construction contracts (*id.* ¶¶ 10-13), that WAPDA had made demand on the guaranties (*id.* ¶ 16), and that AEB had wrongfully refused to honor them (*id.* ¶ 19).  As relief, WAPDA demanded damages in the amount of the guaranties, plus the costs of suit. (*Id.* at 4-5.)

In March 2006, an arbitral hearing was held in Geneva, Switzerland.  (*See* Procedural Order No. 4, Arbitration Between Isolux and WAPDA, ICC Case No.

13158/KGA (Jan. 5, 2006) (Walker Decl. Ex. J at 9).)  Both Isolux and WAPDA

participated fully in the proceeding.  (*See, e.g.*, ICC Award, at 17, 19, 25.)

     Before the arbitral panel issued its decision, AEB on May 8, 2006 filed suit

against Banesto in the Southern District of New York.  In its complaint, AEB alleged that

Banesto breached its agreement to pay AEB under its counterguaranties, and that Banesto

breached the terms and conditions of an account agreement governing a U.S. dollar

account Banesto maintained with AEB.  (Compl. ¶¶ 20, 22.)  AEB demanded damages in

the amount of the counterguaranties, plus the costs of enforcement.  (*Id.* at 4-5).  On

August 16, 2006 AEB moved for summary judgment, and on September 15 2006 Banesto

moved to dismiss the complaint.  In light of the pending decision by the ICC arbitral

panel, the Court dismissed both motions without prejudice to refiling once a decision had

been issued by the ICC panel.  (*See* Orders dated March 22, 2007 and April 5, 2007.)

**D.**    **The Arbitral Decision and Subsequent Proceedings in Pakistan**

     While not communicated to this Court in a timely fashion, the ICC tribunal had

issued its decision on February 6, 2007.  The decision ordered that (1) Isolux pay

WAPDA U.S. $196,116.92 and 892,589 rupees; (2) WAPDA pay Isolux 60,632,495.86

rupees; and (3) WAPDA cancel a large number of guaranties and performance bonds,

among them the guaranties at issue here.  (ICC Award 92-93 & annex 1, at 4.).  Under the

decision, which called for setoffs to be calculated at the exchange rate prevailing on the

date of the award, WAPDA owed Isolux approximately $788,066.  Isolux owed WAPDA

nothing.  According to a report submitted by Banesto and not contested by AEB, the

award became final and binding as a matter of Swiss law upon notification to the parties.

(Letter from Dr. Michael Schöll to Álvaro López de Argumedo & Dorieta Vicente, at 2-3 (Mar. 5, 2007), Cadarso Decl., Ex. C.)

Undeterred by the arbitral decision, WAPDA continued its efforts to enforce the guaranties in Pakistan.  By letter dated May 29, 2007, AEB informed this Court that "WAPDA . . . is not abiding by the award, including the direction to release the guaranties of American Express Bank, and has filed a proceeding in Pakistan to have the award set aside."  (Letter from David Rabinowitz to Hon. Richard J. Howell (May 29, 2007).)  In its defense of that action, AEB specifically claims that (1) WAPDA's demands for payment of the guaranties are *mala fide* (in bad faith), and (2) AEB has no obligation to pay WAPDA.  (*See* Def.'s Application Under Section 10 of the Financial Institutions (Recovery of Finances) Ordinance, 2001, *Pakistan Water and Power Dev. Auth. (WAPDA) v. American Express Bank Ltd., Lahore*, Civil Suit No. 30 of 2005 (Lahore High Court Mar. 8, 2005), Ex. C to Letter from Stephen Marzen to Hon. Richard J. Holwell (June 1, 2007).)

On May 29, 2007, the parties renewed their motions for summary judgment and dismissal in this Court.  (*See* Letter from David Rabinowitz to Hon. Richard J. Holwell (May 29, 2007); Supp. Mem. of Law in Supp. of Mot. to Dismiss of Def. Banco Español de Crédito, S.A. ("Def.'s Third Mem."))  In the most recent round of briefing, AEB claims a right to immediate payment of the counterguaranties regardless of whether it has paid WAPDA and despite its refusal to do so.  (*Id.*)  In the alternative, AEB contends it is entitled to a declaration that if a Pakistani court requires it to pay the principal guaranties, Banesto must pay its counterguaranties.  (*See* Pl.'s Supp. Mem. in Further Opp. to Mot. to Dismiss, at 5 ("Pl.'s Third Mem.").)  Banesto disputes both claims.  Thus, the principal

issues now before the Court are whether, on the current record, AEB has a right to enforce AEB's counterguaranties even though it has not paid the principal guaranties, or, alternatively, to a declaration that if it is ordered to pay the guaranties by a Pakistani court, it will be entitled to repayment.

## II.    DISCUSSION

The Court holds that AEB is not entitled to immediate payment of the counterguaranties or a declaration of its future rights.  Before considering the merits of AEB's claims, however, two threshold issues must be addressed.

## A.    Choice of Forum Law

First, the parties dispute which forum's law governs AEB's claims to payment under the counterguaranties.  Citing an account agreement executed in New York and evidence that Banesto and AEB have an "integrated global relationship," AEB argues that New York law should apply.  (*See* Pl.'s First Mem. 3-5; Pls.' Mem. in Further Supp. of Mot. for Summ. J. and in Opp. to Mot. to Dismiss 3-4 ("Pl.'s Second Mem.").)  Banesto thinks that Spanish law applies, or that if New York law applies, it is not subject to any liabilities here that it would not also be subject to in Spain.  (*See* Mem. of Law in Supp. of Mot. to Dismiss & in Opp. to Summ. J. 14, 20-21 ("Defs.' First Mem.").)

In light of the conclusions the Court reaches below, there is no need to resolve this issue now.  The complaint and the three memoranda of law submitted by AEB assume that New York law applies.  If the complaint does not state a claim under New York law, it necessarily fails to state a claim upon which relief can be granted and Banesto's motion to dismiss must be granted.  For the purposes of the pending motions, the Court will therefore assume that New York law applies.

**B.**      **Choice of Substantive Law**

Next, the parties dispute whether AEB's guaranties and Banesto's counterguaranties, assuming New York law applies, are subject to letter-of-credit law, particularly Article 5 of the New York Uniform Commercial Code.  Banesto contends that AEB's guaranties are "functionally and legally equivalent" to international letters of credit, and thus subject to letter-of-credit law.  (Def.'s First Mem. 15.)  AEB counters that the instruments are simple contracts, not subject to Article 5.  (*See* Pl.'s First Mem. 5.) The practical significance of the dispute is that if letter-of-credit law applies, Banesto can take advantage of the "material fraud" exception recognized in Article 5.  *See* N.Y. U.C.C. § 5-109 (McKinney 2006).  The Court agrees with Banesto, and holds that both the guaranties and the counterguaranties are governed by letter-of-credit law.

By way of background, the typical letter-of-credit transaction involves three legal relationships:  (1) an underlying contractual relationship between the party that obtains the letter of credit (the "applicant") and the party entitled to draw on it (the "beneficiary"); (2) a relationship between the party that issues the letter of credit (the "issuer") and the applicant concerning the terms and amount of the credit; and (3) a relationship between the issuer and the beneficiary, which "embod[ies] the issuer's commitment to 'honor drafts or other demands for payment presented by the beneficiary or a transfer beneficiary upon compliance with the terms and conditions specified in the credit.'"  *Nissho Iwai Europe PLC v. Korea First Bank*, 782 N.E.2d 55, 59 (N.Y. 2002) (quoting *First Commercial Bank v. Gotham Originals*, 475 N.E.2d 1255, 1258 (1985)). *See also 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 741 (2d Cir. 1999) (describing same relationships).

In a standard "commercial" letter of credit, the issuer undertakes to pay the purchase price of goods upon receiving the seller's invoice and other documents evidencing a right to payment.  *See* Dolan, ¶¶ 3.04-3.05, at 3-18 to 3-22.  A "standby" letter of credit differs with respect to the documents necessary to draw on the credit. Unlike a commercial letter, a standby typically does not require the presentation of a negotiable bill of lading or other transport document; instead, the beneficiary may collect simply by certifying that the applicant failed to perform its underlying contractual obligations.  *See* Dolan ¶ 3.06, at 3-23.

Both standby and commercial letters of credit create "an obligation wholly independent of the underlying commercial transaction."  *3Com*, 171 F.3d at 744.  This feature of letters of credit, known as the "independence principle," has been termed a "fundamental principle" of the law of credits.  *Id.*  Because of this principle, it is ordinarily enough to present documents that strictly comply with the terms of a letter of credit to draw on it.

The guaranties and counterguaranties at issue in this case share this essential feature of independence from the underlying contractual relationships, and, therefore, are governed by letter-of-credit law.  In the guaranties, AEB "irrevocably and independently guarantee[d] to pay to WAPDA without delay upon WAPDA's first written demand any amount claim by WAPDA."  (Compl. Ex. 1.)  In the counterguaranties, Banesto undertook to pay AEB "on [its] first simple demand which shall be final and conclusive." (*Id.*)  These provisions plainly reflect the parties' expectation that WAPDA would receive money promptly if it submitted a facially valid certification that Isolux failed to perform its obligations—a defining characteristic of standby letters of credit.

Beyond this, a leading treatise on the law of credits favors treating instruments such as the ones at issue here as letters of credit.  *See* Dolan, ¶ 1.05[2], at 1-31.  As the treatise explains, "foreign banks and foreign branches of domestic banks have introduced a product that they call a 'guarantee' (sic) and to which letter of credit law is quite congenial.  'First-demand guarantees,' 'performance guarantees,' and 'simple-demand guarantees' are the foreign bank equivalents of the standby."  *Id.*

Lastly, at least one decision of a United States Court of Appeals supports the conclusion that the guaranties and counterguaranties are governed by letter-of-credit law. In *Banque Paribas v. Hamilton Industries International, Inc.*, 767 F.2d 380 (7th Cir. 1985), the Seventh Circuit considered a guaranty that, like the ones here, secured performance of a construction contract.[3]  Judge Posner's opinion for the court labeled the guaranty an "international letter of credit" and applied letter-of-credit law.  *See id.* at 381; 384-86.  As the district court in *Paribas* noted, letter-of-credit law applied because the issuer agreed to pay the beneficiary upon its presentation of a facially valid documentary demand for payment, and described its obligations as "unconditional and irrevocable." *Amer. Nat. Bank & Trust Co. of Chicago v. Hamilton Indus., Intern., Inc.*, 583 F. Supp. 164, 169-170 (N.D. Ill. 1984), *rev'd on other grounds*, 767 F.2d 380 (7th Cir. 1985).  So too here.

---

[3] The critical undertakings in the guarantee provided: "we the Guarantor hereby unconditionally agrees [sic] to pay to you forthwith following demand made by you in writing (which writing shall refer to the number and date of this letter of guarantee) to our agent [and] the Guarantor's Agent must receive your written demand hereunder within the period of the effectiveness of this letter of guarantee[.]"  *Banque Paribas*, 767 F.2d at 382.

Without citation to judicial authority, AEB contends that the absence of express conditions requiring "documentary presentation" in Banesto's counterguaranties takes the counterguaranties out of letter-of-credit law.  (*See* Pl.'s Second Mem. 8; N.Y. U.C.C. § 5-102(a)(10) (McKinney 2001) ("'Letter of credit' means a definite undertaking . . . to honor a *documentary* presentation by payment or delivery of an item of value." (emphasis added)).)  AEB's argument, however, ignores the undertakings in the principal guaranties whereby AEB agreed to pay WAPDA "upon [its] first written demand."  (Compl. Ex. A.)  Since the principal guaranties and the counterguaranties were transmitted to AEB in an integrated document (a SWIFT message), the Court finds it rather obvious that Banesto intended the counterguaranties, like the guaranties, to be nothing more than documentary credits.

## C.        Merits

Turning to the merits, AEB contends that it is entitled to immediately enforce the counterguaranties, and to a declaration setting out Banesto's liabilities in the event that it pays WAPDA pursuant to a Pakistani court order.  Neither contention has merit.

### 1.        AEB Has No Basis To Immediately Enforce the Counterguaranties

Taking a somewhat extreme view of the independence principle, AEB first maintains that it is entitled to draw on the counterguaranties regardless of its obligation to pay WAPDA.  (*See* Pl.'s Third Mem. 1; Pl.'s First Mem. 6.)  The flaw in this argument is obvious:  In view of the ICC award—and as a question of basic contract law, international law, and New York law—WAPDA's continued demands for payment of the guaranties lack any basis in law or fact.  Thus, until the award is modified or vacated, neither WAPDA nor AEB has a "colorable right" to demand honor of the guaranties or counterguaranties.  *See* N.Y. U.C.C. § 5-109 official cmt. 1.

First, as for contract:  The construction contracts' arbitration clause provides that "[t]he award of the majority of the [arbitrators] shall be final and binding on both parties."  (ICC Award 2.)  *Cf. Synergy Gas Co. v. Sasso*, 853 F.2d 59, 63-64 (2d Cir. 1988) (noting that under Federal Arbitration Act, the "scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission").  WAPDA participated fully in the ICC arbitration, and lost.  And the parties here have made no suggestion that there is a colorable ground for vacating the award.  In short, on the record before the Court, WAPDA's continued demands for payment  are flatly inconsistent with its contractual obligations.

Second, as for international law:  In 2005, Pakistan ratified the New York Convention on the Recognition and Enforcement Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("N.Y. Conv.").  *See* United Nations Commission on International Trade Law, 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards – the "New York" Convention, http://tinyurl.com/7hsxx4 (last visited Jan. 21, 2009) (noting Pakistan's date of ratification).  Though the convention does not expressly speak to the res judicata effect of an international arbitral award, Stavros Brekoulakis, *The Effect of an Arbitral Award and Third Parties in International Arbitration: Res Judicata Revisited*, 16 Am. Rev. Int'l Arb. 177, 181 (2005), it reflects the principle that until it is successfully challenged, an arbitral award presumptively establishes the rights and liabilities of the parties to the arbitration.  Specifically, the convention provides that subject to its enforcement provisions, "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  N.Y. Conv. art. 3.  WAPDA's continued

demands for payment of AEB's guaranties are inconsistent these international law obligations as well.

Finally, as for New York law:  Since at least 1980, New York courts have recognized that a final and conclusive international arbitral award is res judicata as to a party that fully participated in the proceeding.  *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 452 (N.Y. 1980).  To the extent that the bona fides of WAPDA's and AEB's demands for payment are judged under New York law, the ICC award precludes WAPDA's continuing demands for payment.

Thus, under multiple bodies of law, the ICC award presumptively establishes the rights and liabilities of WAPDA and AEB until such time as WAPDA succeeds in having the award modified or vacated by a court.  AEB, moreover, recognizes this.  In Pakistan, it has argued that all disputes arising out of the construction contracts are to be settled in arbitration; that WAPDA's demands for payment under the guaranties were made in bad faith; and that it has no obligation to pay WAPDA anything.  (*See* Def.'s Application Under Section 10 of the Financial Institutions (Recovery of Finances) Ordinance, 2001, *Pakistan Water and Power Dev. Auth. (WAPDA) v. American Express Bank Ltd., Lahore*, Civil Suit No. 30 of 2005, at 3 (Lahore High Court Mar. 8, 2005), Ex. C to Letter from Stephen Marzen to Hon. Richard J. Holwell (June 1, 2007) ("The two claims . . . lodged by the Plaintiff on the Defendant were . . . *mala fide* and not maintainable."); *id.* at 7 ("The dispute between the Plaintiff and Isolux Wat including the issue whether there has been any default, breach or failure on the part of the contractor will be decided in arbitration which is the forum mutually agreed between the Plaintiff and the Contractor . . . .").)  By demanding immediate payment under the counterguaranties, however, AEB

seeks to have things both ways.  Refusing to recognize the validity of WAPDA's claims in Pakistan, AEB argues in this Court that those very claims (and the remote possibility that a Pakistani court will recognize them at some point in the indefinite future, *see infra* § II.C.2) justify its demand for immediate honor of the counterguaranties.

Whether or not AEB is estopped from taking an inconsistent position here, its position in Pakistan better reflects the legal relationships at the heart of this case.  AEB has no obligation to pay under its guaranties and, therefore, no good faith basis to demand payment of the counterguaranties issued by Banesto.  It follows that, on the current record, Banesto's refusal to honor AEB's demands for honor is proper.  *Brenntag Intern. Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999); *Recon/Optical, Inc. v. Gov't of Israel*, 816 F.2d 854, 858 (2d Cir. 1987); *Ground Air Transfer, Inc. v. Westates Airlines, Inc.*, 899 F.2d 1269, 1273-74 (1st Cir. 1990); *Roman Ceramics Corp. v. Peoples Nat. Bank*, 714 F.2d 1207, 1213 (3d Cir. 1983).

**2.     AEB Is Not Entitled to Declaratory Relief**

Anticipating this conclusion, AEB points out that there is nothing illegitimate about WAPDA's efforts to have the arbitral award vacated in Pakistan.  It thus argues that "to avoid possible future circularity of payment," the Court should issue a declaration that AEB will be entitled to payment if it is ordered to pay WAPDA by a Pakistani court. (Pl.'s Third Mem. 5.)

The first half of this argument is sound.  Though WAPDA's continued demands for payment are unjustified in view of the ICC award, nothing in the award or the law of judgments precludes WAPDA from undertaking legal efforts to have the award vacated. Indeed, though the question is not yet presented, the Court is preliminarily of the view that if AEB pays WAPDA because it has been ordered to do so by a Pakistani court,

Banesto will be under an obligation to reimburse it.  In such circumstances, AEB could

make a good faith demand for honor of the counterguaranties, as the presumption of

validity that attaches to the arbitral award would no longer be conclusive.  And even if

the *counterguaranties* could not be enforced because of the Spanish injunction, Banesto

likely would have an independent obligation to reimburse AEB by virtue of having

procured the guaranties from AEB.  *Cf.* N.Y. U.C.C. § 5-108(i)(1) ("An issuer that has

honored a presentation as permitted or required by this article . . . is entitled to be

reimbursed by the applicant in immediately available funds not later than the date of its

payment of funds . . . .").

It does not follow, however, that AEB currently is entitled to a declaration of its

future rights.  The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "In a case

of actual controversy within its jurisdiction . . . any court of the United States . . . may

declare the rights and other legal relations of any interested party seeking such

declaration . . . ."  The act does not expand the constitutional limitations on federal

judicial power.  *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325 (1936).

Instead, an action for a declaratory judgment can be maintained only if a case presents a

justiciable controversy under Article III of the Constitution, meaning among other things

that "[c]laims based merely upon 'assumed potential invasions' of rights are not enough

to warrant judicial intervention."  *Id.* (quoting *Arizona v. California*, 283 U.S. 423, 462

(1931)).

When a controversy depends on a future or contingent event, these limitations call

for careful analysis of whether the dispute presents an "actual controversy."  On one

hand, the simple fact that a liability is contingent "does not necessarily defeat jurisdiction

of a declaratory judgment action." *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (dictum).  If however "the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks 'sufficient immediacy and reality' to warrant declaratory relief."  *In re: Prudential Lines, Inc.*, 158 F.3d 65, 70 (2d Cir. 1998).

A good example is *Certain Underwriters at Lloyd's, London v. St. Joe Mineral Corp.*, 90 F.3d 671 (2d Cir. 1996).  There, several London-market insurers sought a declaration setting limits on their liability after the Environmental Protection Agency named the insured a "Potentially Responsible Party" at twenty sites contaminated with toxic waste.  *See id.* at 672-73.  Because there were substantial questions about whether the insured would ever be held liable by the EPA, the court concluded the case was not yet "justiciable and ripe."  *Id.* at 676 (quoting *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 889 F. Supp. 65, 67 (N.D.N.Y. 1995)).  The court noted: "the record as a whole consists in large measure of speculation. Uncertainty surrounds St. Joe's liability. It has viable defenses, there are numerous other PRPs to share the unestablished remedial costs, and the challenged activity is spread out over a substantial time period . . . ."  *Id.* at 674.  Accordingly, the court dismissed the complaint without prejudice and invited the insurers to file a new action "at some future time [when] a more complete development of the facts might lead to a different result."  *Id.* at 676.

Dismissal pending further developments is likewise the proper course here. Pakistan's courts have not yet ruled on WAPDA's challenge to the ICC Award.  There is

no way of telling when—if ever—they will rule.[4]  And there is no way of telling what relief they will grant.  AEB's request for declaratory relief thus asks the Court to assume that Pakistan's courts will rule in WAPDA's favor in a way that both requires AEB to pay the guaranties, and triggers a corresponding duty on the part of Banesto to pay the counterguaranties.  Though the question is close, the Court finds that in view of these multiple contingencies, the disagreement between AEB and Banesto has not yet "taken on [a] fixed and final shape so that [the] court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."  *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 244 (1952).

Even if there were Article III jurisdiction over AEB's claim, the Court would decline to hear it in the exercise of its discretion.  "[A] district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close," particularly when doing so is consistent with "considerations of practicality and wise judicial administration."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).  Because of the uncertainty surrounding proceedings in Pakistan, wise judicial administration counsels in favor of declining to hear AEB's claim now.

* * *

Undeniably, this decision leaves AEB in a difficult position.  If Pakistan's courts order that AEB honor the principal guaranties, AEB honors the guaranties, and Banesto

---

[4] The Court delayed issuing this opinion for more than a year to allow for developments in Pakistan.  On October 28, 2008, the parties informed the Court that there were no developments to report.

refuses to honor the counterguaranties or otherwise reimburse AEB, AEB will be required to initiate a new action to recoup payment from Banesto. As the Court has already indicated, a demand for honor in the event that AEB was ordered to pay the guaranties would almost certainly be made in good faith. Moreover, Banesto would likely have an independent obligation to repay AEB if AEB paid WAPDA in reliance on a Pakistani court judgment. But this is not the scenario before the Court. And until Pakistan's courts act, this Court cannot, consistent with the Constitution's limits on federal jurisdiction, issue a binding declaration of the future rights of AEB and Banesto.

## III.    CONCLUSION

Banesto's motion to dismiss [21] is granted without prejudice to the filing of a new action following entry of judgment in Pakistan. AEB's motion for summary judgment [18] is denied. The Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
       February __11__, 2008

Richard J. Holwell
United States District Judge

- 21 -